**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re:<br>James D. Paulsen,<br>　　　　　Debtor.<br>_____<br><br>Joseph D. Olsen, Trustee for the<br>Estate of James D. Paulsen,<br>　　　　　Plaintiff,<br>　　v.<br><br>James D. Paulsen, individually,<br>Kathleen M. Paulsen, individually,<br>and James D. Paulsen and Kathleen<br>M. Paulsen, as Trustees and<br>Beneficiaries of the Paulsen Family<br>Trust Dated January 19, 2019,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Bankruptcy No. 19-82505<br><br>Chapter 7<br><br>Judge Lynch<br><br><br>Adversary No. 20-96020 |

## MEMORANDUM OPINION

For more than 40 years, James Paulsen and Kathleen Paulsen, his non-filing spouse, have owned their residence in Ringwood, Illinois, in joint tenancy. In January 2019, they transferred their interests in the Ringwood property into a newly formed family trust in which the Paulsens owned beneficial interests in tenancy by the entirety. This transfer occurred several months after McHenry Savings Bank sued Mr. Paulsen on its loan of more than $300,000 that the Debtor and his son had taken out for their business. Mr. Paulsen had guaranteed the business loan. That liability was Mr. Paulsen's only significant debt at the time of the transfer and the only debt he listed in his schedules when he filed his bankruptcy petition later that year.

Mr. Paulsen claims an exemption in his interest in the residence and trust

under the Illinois tenancy by the entirety statute, 735 ILCS 5/12-112. The chapter 7 Trustee objects, arguing that the Defendants transferred the property with the sole intent to avoid the payment of the McHenry Savings Bank debt. The Trustee also seeks to avoid the transfer of Mr. Paulsen's direct interest in the residence to the trust. A trial was conducted on these issues at which the Paulsens and others testified.

For the reasons discussed below, the court finds that the Trustee has established by a preponderance of the evidence that the transfer was made with the sole intent to avoid the payment of debt existing at the time of the transfer beyond Mr. Paulsen's ability to pay as it became due. As such, the statutory exclusion to the tenancy by the entirety exemption applies, the Trustee's objection will be sustained, and judgment will be entered in favor of the Trustee on Counts I and II of the complaint, avoiding the transfer of Mr. Paulsen's interest in the residence. However, the Trustee has not demonstrated that sale of Mrs. Paulsen's interest in the residence is warranted under 11 U.S.C. § 363(h). Judgment will therefore be entered in Mrs. Paulsen's favor on Count III, but without prejudice.

## PROCEDURAL BACKGROUND

The Debtor filed his chapter 7 petition on October 29, 2019. In his schedules filed with the petition, he listed the Ringwood property to be worth $300,000 and owned in "Tenancy by the Entirety Held in Land Trust," and asserted a 100% exemption in his interest under 735 ILCS 5/12-112. He amended his schedules on January 22, 2020, but made no change to his description of the Ringwood property or

this claim of exemption.  The court extended the time to object to exemptions and the Trustee filed his objection to the Debtor's claim of exemption on May 27, 2020. (ECF No. 46.)

Relying on the Illinois statute, the Trustee asserts that the property was transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the Debtor's ability to pay those debts as they become due, thereby disqualifying him from asserting the exemption. The Trustee also invokes the statute to allege that the exemption is not allowable as to income generated by the property.  Finally, citing *In re Jaffe*, 932 F.3d 602 (7th Cir. 2019), he asserts the exemption does not apply to the Debtor's contingent future interest in the property.

The Trustee also brought this adversary proceeding against James and Kathleen Paulsen, individually, and in their capacities as Trustees and Beneficiaries of the Paulsen Family Trust Dated January 19, 2019.  Count I of his complaint asserts the Trustee's powers under 11 U.S.C. § 544(b) (and by incorporation 735 ILCS 5/12-112) to avoid the transfer of the Debtor's interest in the Ringwood property to the family trust.  Count II seeks to recover the transferred interest or its value from the family trust under 11 U.S.C. § 550.  Finally, Count III requests that the Trustee be authorized under 11 U.S.C. § 363(h) to sell both the Debtor's interest and Kathleen Paulsen's interest in the Ringwood residence.

The Debtor and Kathleen Paulsen timely answered the complaint.  Asserting that the Ringwood residence is fully exempt as owned in tenancy by the entirety, the

Debtor moved to compel the Trustee to abandon the estate's interest in the residence and trust. (ECF No. 61.)[1]

The court heard the matters on a consolidated basis, recognizing the overlap in issues for the objection to exemption, the adversary proceeding and the motion to compel abandonment. The Defendants initially moved to dismiss the adversary proceeding. Their primary argument was that 735 ILCS 5/12-112 does not provide a creditor with power to avoid a transfer which could be adopted by a bankruptcy trustee under 11 U.S.C. § 544(b) and that a "transformation" of an interest in property from joint tenancy to tenancy by the entirety is not a "transfer" which can be avoided under section 544. The court rejected both legal arguments in its memorandum opinion dated September 29, 2020. (ECF No. 27.) In that decision, the court additionally found that the complaint met the pleading standards of Rules 8 and 9 and stated a claim for relief. Later, the Defendants moved for summary judgment. That, too, was denied, together with the Defendants' separate motion for judgment on the pleadings. (ECF Nos. 72, 73.)

The court conducted a trial on July 12, 2021, August 23, 2021, and September 1, 2021. Due to the then ongoing coronavirus pandemic, the trial was held via its video teleconference platform with the parties' consent. In anticipation of trial, the parties submitted a joint stipulation of certain facts. (ECF No. 63.) During the trial the court received over three dozen exhibits, heard the testimony of James and

---

[1] The Debtor's motion also sought to compel the Trustee to abandon the estate's interest in the Debtor's potential claims against McHenry Savings Bank for lender liability and bad faith. That portion of the motion was granted without objection. (ECF No. 71.)

Kathleen Paulsen, their son Daniel Paulsen, and their attorney James Magee, as well as the testimony of the Trustee Joseph Olsen.  The court will note at the outset that the testimony of the Defendants as to motives for executing the trust and transfer instruments and ability to pay the bank's judgment debt was not credible.  In considering the Defendants' testimony, their demeanor, and how their answers to questions related to other evidence at trial, it was clear that this testimony was self-serving, evasive, and vague.  Both Defendants had an obvious interest in preserving their equity in the Ringwood residence and insulating it from the bank's efforts to collect its debt.

### JURISDICTION

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This matter involves the allowance or disallowance of exemptions from property of the estate, the avoidance of transfers, and the sale or abandonment of estate property and, therefore, is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (H), (N) and (O). *See, e.g., Kelley v. Boosalis,* 974 F.3d 884, 902 (8th Cir. 2020) (section 544 proceedings are core); *In re Green,* No. 21 B 06189, 2022 Bankr. LEXIS 630, at *2 (Bankr. N.D. Ill. Mar. 9, 2022) (allowance or disallowance of exemptions from the bankruptcy estate is a core matter for which a bankruptcy court has authority to enter final judgment). Additionally, the parties have stipulated to entry of final order or judgments by this court pursuant to *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665 (2015).

## FINDINGS OF FACT[2]

James and Kathleen Paulsen have owned their residence in Ringwood, Illinois since 1974. From at least 1998 through 2019 they owned the property "as joint tenants with the right of survivorship." They have had no recorded mortgage or liens on the property since at least 2011. In January 2014, the Debtor and his son Daniel Paulsen obtained a $345,000 business loan from McHenry Savings Bank for their company, Paulsen Paving Company. The Debtor is liable on the loan; Kathleen is not. The Debtor and Daniel pledged as collateral for the loan certain commercial real estate, equipment and other assets related to their company. They closed the business sometime in 2016 or 2017. Mr. Paulsen testified that the company "was generating no income whatsoever" in 2016, 2017 and 2018.

The Debtor and his son fell behind in payments on the McHenry Savings Bank debt. A January 9, 2019, payoff letter lists an asserted payoff amount of $361,521.69 and states that it received the last payment on July 20, 2018. Mr. Paulsen testified that "he had difficulty making the monthly payments in a timely fashion" largely because his "only source of business income was the sale of equipment." He also admitted that he did not pay property taxes on the commercial real estate on time. The 2016 taxes payable in 2017 were not paid on time. Ultimately, the Paulsens redeemed those taxes by paying just over $10,000, made possible through the sale of equipment that was part of the collateral on the McHenry Savings Bank loan.

---

[2] The following findings, together with those set out in the "Discussion" below, set forth the court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

McHenry Savings Bank sued the Debtor and Daniel on October 15, 2018, in the Twenty-Second Illinois Judicial Circuit (McHenry County).  Its complaint alleges a default on the loan, in part due to the borrowers' failure to pay 2016 or 2017 real estate taxes on the commercial property.  On October 8, 2019, the bank obtained a judgment against the Debtor and his son in the state court in the amount of $348,531.15.

The Debtor and Daniel Paulsen met with attorney James Magee, the attorney who would eventually represent the Debtor in this bankruptcy case,  on January 7, 2019, based on the referral of their former attorney.  Two days later, Mr. Magee sent the referring attorney an email describing the meeting and stating that he offered to appear on the Paulsens' behalf in the McHenry County lawsuit for a retainer of $2,500.  He then added that he "would be able to do the conveyance into a land trust and trust agreement establishing a Tenancy By The Entirety for the parents for $250."  On the advice of attorney Magee, the Debtor and Kathleen Paulson executed a Deed in Trust and Trust Agreement prepared by Mr. Magee on January 19, 2019.  This instrument transferred the Paulsens' interests in the Ringwood property to a newly formed trust in which the Debtor and Kathleen held the beneficial trust interests in tenancy by the entirety.  The deed in trust was recorded January 25, 2019, and attorney Magee entered his appearance for the Debtor and his son in the McHenry Savings Bank litigation on January 28, 2019.

The evidence further shows that as of the time of the transfer of the Ringwood residence into the trust, the Debtor owed McHenry Savings Bank more than

$345,000. At the time of the transfer such debt had been accelerated. Shortly afterward, the Debtor provided the bank with his personal financial statement dated January 24, 2019, which listed his assets to be: $8,500 in cash held in joint tenancy with his spouse, three life insurance policies listing his spouse as beneficiary, the commercial property for which he listed an original cost of $345,000 and no current market value, and the Ringwood residence, which he valued as $275,000, but which he denoted as "50% of the tendency of the entirety [sic]." He listed his only liabilities to be the McHenry Savings Bank debt and two credit card balances totaling $2,920.00.

Barry Lederer is a retired firefighter whom the Debtor describes to be his friend and former employee. Evidence was presented that Lederer and the Paulsens entered into a sale agreement on or about February 22, 2019, to buy the Paulsen Construction Company property located at 1405 Lamb Road, Woodstock, Illinois, for $275,000. (Pl.'s Ex. 1U.) The commercial property includes a building constructed in 1943 to make components for WWII era fighter planes. The Lederer sale agreement included a contingency term that Mr. Lederer secure financing for at least $220,000. It also stated that the contract was contingent upon the buyer's approval "of the condition of the real estate as evidenced by an inspection/environmental site assessment conducted at the seller's or seller's lender's expense." On cross-examination, Mr. Paulsen reluctantly acknowledged becoming aware in September 2018 that an environmental inspection of the property had identified contaminated soils. He then added: "And I told them, no, they were wrong, that they should check

on it, and they – they dug a big hole to check on it quite a time later.  I just could not believe that.  How do you waste that money when there's nothing there?" No evidence was presented to show – and the Defendants do not suggest – that the Paulsens conducted any environmental site assessment or mediation of the commercial property afterward in 2018 or in 2019.

In June 2019, Mr. Lederer deposited $53,000 into a bank account of the Debtor's daughter-in-law, Michelle Paulsen, said funds to be held in escrow.  Mr. Lederer never secured financing for the purchase and the Debtor never conducted the environmental site assessment.  Further, he did not approve of an environmental waiver release for the commercial property.  On or around June 19, 2019, Lederer through his attorney declared the sale agreement to be "null and void."  It is undisputed that the Debtor never had use of the $53,000 deposit, which was later transferred back to Mr. Lederer in August 2019 after the proposed sale fell through. Although listed as a rebuttal witness, Mr. Lederer was never called to testify.

The Debtor commenced his chapter 7 case on October 29, 2019.  Attorney Magee prepared his petition and schedules and represents the Debtor in the bankruptcy proceedings.  In his bankruptcy schedules, the Debtor describes the nature of his ownership interest in the homestead as "Tenancy by the Entirety Held in Land Trust" and asserts a 100% exemption in his interest under "735 ILCS 5/12-112."  The Debtor is listed as retired, with his only income from Social Security.  His schedules list his and his spouse's combined monthly income as $5,374 and that their combined monthly expenses, not including the McHenry Savings Bank debt, is

$5,194, revealing the combined monthly disposable income of James and Kathleen to be $180. Mr. Paulsen stated that his total gross income for the prior year was $22,500 and $19,200 in 2017.

Daniel Paulsen and his spouse filed a joint chapter 7 bankruptcy petition in Wisconsin on November 21, 2019. In their schedules they listed their net monthly disposable income, not including any payment to McHenry Savings Bank, to be $117.50.

## DISCUSSION

A. Applicable Legal Standards.

The Bankruptcy Code permits debtors to exempt from the bankruptcy estate "any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law." 11 U.S.C. § 522(b)(3)(B). Illinois law exempts property held in tenancy by the entirety[3] from process as to a judgment against only one tenant, but with certain limitations. 735 ILCS 5/12-112. Notably, the exemption does not apply "if the property was transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the transferor's ability to pay those debts as they become due." *Id.* The exemption does not apply to garnishment of income from the property. *Id.* The

---

[3] In addition to real property held directly in tenancy by the entirety, the exemption also applies to "any beneficial interest in a land trust, or any interest in real property held in a revocable inter vivos trust or revocable inter vivos trusts created for estate planning purposes." 735 ILCS 5/12-112.

7th Circuit has determined that the exemption applies only to the tenancy interest itself and does not apply to future contingent interests that tenants hold in their sole capacity, including each tenants' right to obtain "(a) an interest as a tenant in common in the event of a divorce, (b) an interest as a joint tenant in the event that another homestead is established, and (c) a survivorship interest in the entire property in the event of the other tenant's death." *In re Jaffe*, 932 F.3d 602, 605 (7th Cir. 2019) (citing 765 ILCS 1005/1c).

As discussed in this court's September 29, 2020, memorandum opinion, although 735 ILCS 5/12-112 is phrased as an exemption statute, the Illinois Supreme Court has interpreted the exception for property "transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the transferor's ability to pay those debts as they become due" to also provide grounds to avoid a transfer into such tenancy. *Premier Prop. Mgmt. v. Chavez*, 191 Ill. 2d 101, 114 (2000). The so-called "strong arm clause" in section 544(b) of the Bankruptcy Code in turn gives the bankruptcy trustee the power to "avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law." *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide)*, 139 F.3d 574, 577 (7th Cir. 1998).

**Burden of Proof.** The trustee bears the burden of proof both with respect to his objection to the Debtor's claim of exemption and with respect to his avoidance action against the Defendants under section 544(b). Bankruptcy Rule 4003(c) provides that with respect to objections to claim of exemptions, "the objecting party has the burden

of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003(c). The trustee has been held to hold the burden of proof for an action to avoid a fraudulent transfer under section 548 of the Bankruptcy Code. *See, e.g., Barber v. Golden Seed Co.,* 129 F.3d 382, 387 (7th Cir. 1997). Courts have similarly allocated the burden of proof to the trustee for avoidance actions under section 544's strong-arm clause. *See, e.g., Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 779 (Bankr. N.D. Ill. 2007); *Stone v. Ottawa Plant Food, Inc. (In re Hennings Feed & Crop Care, Inc.)*, 365 B.R. 868, 874 (Bankr. C.D. Ill. 2007).

The evidentiary standard that the Trustee must meet is less clear, however. Both the exemption issue and the avoidance issue blend federal and state law. For both issues, the right is given by federal bankruptcy law. But the bankruptcy statute incorporates by reference a right that originates under state law. Neither the Supreme Court nor the 7th Circuit has established the appropriate burden for either an objection to exemption or to a section 544 avoidance action incorporating state law issues, or explained whether the burden is established by federal or state law. In *Grogan v. Garner*, the Supreme Court held that while the "validity of a creditor's claim is determined by rules of state law," the issue of nondischargeability is "a matter of federal law governed by the terms of the Bankruptcy Code." 498 U.S. 279, 284-85 (1991). The Court therefore looked to federal law to determine the burden of proof for nondischargeability. *Id.* But in *Raleigh v. Illinois Department of Revenue*, 530 U.S. 15 (2000), the Court indicated that with respect to claims against the bankruptcy estate and related objections, the burden of proof is to be determined

under the standard set by the underlying law creating the claim. The Court held that "the burden of proof is an essential element of the claim itself" and the Bankruptcy Code "does not alter the burden imposed by the substantive law" of claims. *Id.* at 17, 21. The Court rejected an argument that "allowance" of claims was a separate "federal matter," instead finding that except as expressly modified or authorized by the Bankruptcy Code, "the validity of a claim is generally a function of underlying substantive law." *Id.* at 24.

However, this court need not decide today whether the evidentiary burden for either exemptions or avoidance is determined by federal or Illinois law, for the court finds that under either, the standard is the preponderance of the evidence. With respect to federal law, in *Grogan* the Supreme Court noted that the "preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants," and held that where a federal law is silent, "we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" 498 U.S. at 286 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90 (1983)). *Grogan* involved the standard for determining dischargeability of certain fraud-related claims, but the Court found that neither the existence of the "fraud" element nor the effect on the important "fresh-start" policy of the discharge justified a heightened "clear and convincing evidence" standard. *Id.* The Court noted that even the "fresh start" policy is limited to the "honest but unfortunate debtor." *Id.*

Both sections 522 and 544 are silent as to the evidentiary standard. There is

no general policy justifying a heightened burden for either objections to bankruptcy exemptions or avoidance actions by a bankruptcy trustee. *See, e.g., In re McQuaid*, 492 B.R. 514, 516 (Bankr. N.D. Ill. 2013) (standard for objections to exemptions is preponderance of the evidence) (citing *In re Doyle*, 209 B.R. 897, 900 (Bankr. N.D. Ill. 1997)).  Some courts have applied a higher burden for avoidance actions involving actual fraud, but they have generally done so while applying a burden under state law. *See, e.g., Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743 (7th Cir. 2012) (stating that actual fraudulent intent under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1) must be proven by clear and convincing evidence).  In contrast, most decisions since *Grogan* have applied the preponderance of the evidence standard to fraudulent transfer claims under the federal Bankruptcy Code. *See, e.g., Asarco LLC v. Ams. Mining Corp.,* 396 B.R. 278, 365-69 (S.D. Tex. 2008) (listing cases); 5 Collier on Bankruptcy P 548.11 (16th 2021) (stating that "[t]he better reasoned decisions require proof only by the general federal standard of a preponderance of the evidence" for actions under section 548(a)(1)(A)).

Similar to *Grogan*, the Illinois Supreme Court has held that in "the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 191 (2005).  Like *Grogan*, *Avery* involved a statutory claim involving fraud. The court acknowledged that in "the context of common law fraud, the law presumes that transactions are fair and honest" and accordingly "fraud must be proved by clear and

convincing evidence." *Id.* at 191-92 (citing *Racine Fuel Co. v. Rawlins*, 377 Ill. 375, 379-80 (1982)). However, the court distinguished statutory claims from common law claims. Noting that the Illinois Consumer Fraud Act "does not expressly provide the standard of proof required to succeed in a private cause of action" as well as the Act's purpose to provide protection to consumers, the Illinois Supreme Court held that the usual preponderance of the evidence standard of proof applied to cases under the statute and expressly overruled earlier cases that had required a clear and convincing standard of proof. *Id.* at 192.

The relevant source of applicable nonbankruptcy law here, both with respect to the exemption and for the avoidance action, is 735 ILCS 5/12-112. All published opinions enunciating the evidentiary standard with respect to the "sole intent" provision have applied the preponderance of the evidence standard. *Heartland Bank & Tr. Co. v. Goers*, 2013 IL App (3d) 120854-U, ¶ 28; *Harris Bank, N.A. v. Werner (In re Werner)*, 410 B.R. 797, 812 (Bankr. N.D. Ill. 2009); *In re Moreno*, 352 B.R. 455, 461 (Bankr. N.D. Ill. 2006); *In re Gillissie*, 215 B.R. 370, 374, 378 (Bankr. N.D. Ill. 1997). *See also Brown v. Stacy (In re Stacy)*, 227 B.R. 272, 278 (Bankr. N.D. Ill. 1998) (in context of Rule 12(b)(6) motion to dismiss stating in dicta that Trustee must show "by a preponderance of the evidence" that debtor was unable to pay debts as they became due and transfer was with sole intent and exclusive purpose of avoiding those debts).[4]

---

[4] The district court in *Stacy* reversed, holding as the Illinois Supreme Court would later hold in *Premier Properties*, that an avoidance action with respect to a transfer into tenancy by the entirety must be brought under section 12-112 rather than under the Uniform Fraudulent Transfer Act. *In re Stacy*, 223 B.R. 132 (N.D. Ill. 1998). Although the bankruptcy court had discussed section 12-112, the district court found the complaint's failure "even to reference § 12-112" fatal for purposes of Rule 12(b)(6) and therefore reversed the lower court. *Id.* at 136. The district court did not address the issue of evidentiary burdens.

The Defendants cite *Wachovia Securities, LLC v. Banco Panamericano, Inc.,* 674 F.3d 743 (7th Cir. 2012), for the proposition that the higher clear and convincing standard should apply to avoidance actions under 735 ILCS 5/12-112. In a single line in *Wachovia*, the court states that "Wachovia had to prove Loop's actual intent by clear and convincing evidence" to support its claim under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/5(a)(1). *Id.* at 757 (citing *Hofmann v. Hofmann*, 94 Ill. 2d 205 (1983)). The Defendants reason that because the Illinois Supreme Court stated in *Premier Property* that the "sole intent standard" of section 12-112 "provides greater protection from creditors for transfers of property to tenancy by the entirety" than under the Uniform Fraudulent Transfer Act's "actual intent standard," 191 Ill. 2d at 110, the evidentiary burden under section 12-112 must also be at least as high or higher than under the Uniform Fraudulent Transfer Act.

The court disagrees. *Premier Property* did not discuss the evidentiary standard. Moreover, the court further explains the "greater protection" not in terms of the standard of proof, but rather what must be proven: "if property is transferred to tenancy by the entirety to place it beyond the reach of the creditors of one spouse *and* to accomplish some other legitimate purpose, the transfer is not avoidable." *Id.* Indeed, because the effect of transferring property to tenancy by the entirety will always have the result of insulating it from the creditors of only one spouse, the Uniform Fraudulent Transfer Act standard potentially would have made *any* transfer into tenancy by the entirety avoidable. *See, e.g., In re Stacy*, 223 B.R. 132, 136 (N.D.

Ill. 1998).[5]

Additionally, while binding authority with respect to the UFTA, the court's reasoning in *Wachovia* is suspect in light of the Illinois Supreme Court's decision in *Avery* as the UFTA creates a statutory right of action and is silent as to the evidentiary burden to be applied. The *Wachovia* court makes no reference to *Avery*, and instead reaches its conclusion as to the clear and convincing standard through a single citation to a 1983 case that did not involve the Uniform Fraudulent Transfer Act. 674 F.3d at 757. The 1983 case, *Hofmann v. Hofmann*, was in the context of a dissolution of marriage and division of marital property proceeding. 94 Ill. 2d 205 (1983). In discussing the contention that the husband's forfeiture of a farm he was in the process of purchasing from his parents under an installment contract was a "fraud on his wife's marital property," the court stated generally that as "fraud will not be presumed in this State and must be proved by clear and convincing evidence," citing a common law fraud case. *Id.* at 222 (citing *Ray v. Winter*, 67 Ill. 2d 296 (1977)). In other words, the conclusion that a statutory cause of action has a heightened burden merely because common law fraud does is just the sort of reasoning that the Illinois Supreme Court cautioned against in *Avery*. 216 Ill. 2d at 192. In any event, the instant case does not involve the UFTA, and the Illinois Supreme Court has emphasized in *Premier Properties* that the "standard of the amended tenancy by the

---

[5] Stating "[p]erhaps the legislature, reacting to the *McKernan* analysis that every transfer into tenancy by the entirety would violate the UFTA because the very purpose of the transfer is to protect the homestead from creditors, decided to restrict the exception in § 12–112 to a narrow range of cases in which the creditor could prove that the transfer served no purpose other than to avoid the transferor's debts as they became due." *Stacy*, 223 B.R. at 136.

entirety provision is substantially different from the actual intent standard of the Fraudulent Transfer Act." 191 Ill. 2d at 110.

This court therefore finds *Wachovia* distinguishable and concludes that to the extent that Illinois law establishes the relevant evidentiary burden in this case, that burden, too, is the preponderance of the evidence.

B. <u>The Chapter 7 Trustee Has Met His Burden To Establish That The Transfer Is Excluded From The Tenancy By The Entirety</u>.

After carefully weighing the evidence presented, the court concludes that the Trustee has established by a preponderance of the evidence that the Debtor's transfer of his joint tenancy interest in the Ringwood residence to the family trust in exchange for a beneficial interest in the nature of tenancy by the entirety was made with the sole intent to avoid the payment of his existing debt to McHenry Savings Bank. The court further concludes that the Trustee also met his burden to prove that the transfer was made at a time when the Debtor was unable to pay his debt to McHenry Savings Bank as it became due.

The Trustee first points to the evidence of the timing of the transaction as strongly probative of the Debtor's focus and motivation being to prevent McHenry Savings Bank from being able to enforce its debt against the Ringwood residence. It is uncontroverted that the Paulsens decided to transfer their decades-long joint tenancy interest in the residence after Mr. Paulsen was sued by McHenry Savings Bank and before he and his son responded to the bank's complaint. Defendants admit that the suggestion to transfer the property into a trust and tenancy by the entirety came from the attorney whom the Debtor retained to represent him in the McHenry

Savings Bank suit. That attorney then prepared the transfer instruments. The parties stipulated that it was the Debtor and Daniel Paulsen who first met with that attorney on January 7, 2019, on the referral of their former attorney in the state court action. Two days later, attorney Magee wrote the former attorney about that meeting, stating that he had offered to appear in the suit for the Paulsens for a retainer of $2,500 and that he "would be able to do the conveyance into a land trust and trust agreement establishing a Tenancy By The Entirety for the parents for $250." James and Kathleen signed the trust and conveyance documents a week and a half later on January 19, 2019, the deed in trust was recorded January 25, 2019, and attorney Magee entered his appearance for the Debtor and his son in the McHenry Savings Bank action on January 28, 2019. Noteworthy, too, is the Debtor's own testimony that on January 19, the day he executed the transfer documents, he (1) "understood that protecting the marital home from the debts of one spouse was one of the features of a tenancy by the entirety," (2) had as his one and only liability the debt to McHenry Savings Bank "with an approximate balance of $350,000," and (3) knew that his wife was "probably" not liable on the bank note but he was.

The Defendants respond with two principal arguments. First they contend that the Debtor did not intend to avoid payment of the debt. Second, they argue in the alternative that any intent to avoid payment of the debt was not the sole purpose for their decision to prepare and execute the transfer. Neither argument is persuasive when considered in the light of the evidence.

First, the Defendants contend that in January 2019 the Debtor subjectively

believed that he had the ability to repay McHenry Savings Bank from sources other than the Ringwood residence, and therefore did not "intend" to avoid payment by the transfer of his interest in the residence.  In support, they principally rely on their assertion that Mr. Lederer, a friend and former employee of the Paulsens, had agreed to purchase the commercial real estate securing the McHenry Savings Bank loan for $275,000 and had agreed to lend them up to an additional $53,000.  Regarding the shortfall still remaining should that occur, the Defendants suggest they could have sold the defunct company's commercial equipment also securing the McHenry Savings Bank loan for up to $50,000.  The evidence shows these claims to be unsupported, if not purely fanciful.

Some evidence was presented that Lederer and the Paulsens entered into an agreement to sell the commercial property for $275,000 more than a month *after* the transfer.  However, that agreement was subject to several contingencies and the proposed sale fell through within a matter of months.  First, the sale was contingent upon Mr. Lederer, a retiree, obtaining at least $220,000 financing for the purchase. It is undisputed that he never received financing.  Nor did the Defendants present any non-speculative evidence about Mr. Lederer's finances that indicates that they had a reasonable basis to expect him to obtain the financing needed to purchase the commercial property.  Indeed, scant information was presented about Mr. Lederer in general – beyond his being a former employee of the Paulsens and a retired fireman – and virtually nothing as to his ability to secure a $220,000 loan.  Although he was listed as a witness, Mr. Lederer was never called to testify.

In light of this uncontroverted evidence, the court finds not credible the Defendants' contentions that Mr. Lederer was able to purchase the commercial property for $275,000 and that Mr. Paulsen reasonably believed that to be the case at the time he transferred his interest in the Ringwood residence. And while the Debtor testified that Lederer deposited $53,000 into Mr. Paulsen's daughter-in-law's bank account in June 2019 supposedly to hold in escrow, it is undisputed that the Debtor never had use of those funds. The deposited funds were later transferred back to Mr. Lederer in August 2019 after the proposed sale fell through.

The evidence shows that at the time of the transfer the Debtor knew or should have known that the sale to Lederer would not provide enough funds to enable the Debtor to satisfy in full of the McHenry Savings Bank judgment. In a December 14, 2018, letter to McHenry Savings Bank's counsel, the Debtor's counsel mentions the offer, but states that the "offer will be less then [sic] the amount sought by the Bank in the subject litigation." The letter goes on to state that the Debtor asked counsel "to inquire whether or not the Bank would authorize a short sale and its position as to a reasonable waiver as to the deficiency."

In connection with these negotiations, the Debtor apparently requested a payoff letter and the bank asked him for a personal financial statement. On or about January 9, 2019, the bank presented its letter which listed the payoff amount to be $361,521.69 as of January 21, 2019.

Ten days after the bank gave him the payoff letter, the Debtor signed documents creating the trust and transferring the residence into the trust held in

tenancy by the entirety.  Five days after signing the transfer documents, but a day before the deed was recorded, the Debtor prepared and provided to the bank his personal financial statement indicating that he held a tenancy by the entirety as to the residence, a designation signaling that his  property interest in the residence was insulated from enforcement.   The Debtor's personal financial statement, dated January 24, 2019, lists as his only assets to be $8,500 in cash held in joint tenancy with his spouse, three life insurance policies designating Kathleen as beneficiary, the commercial property valued at its original cost of $345,000 with no current market value provided, and the Ringwood residence.   The Debtor's statement valued the residence to be $275,000, which he denoted as "50% of the tendency of the entirety [sic]."  Some four months later, the Debtor signed a proposed settlement agreement that proposed to pay the bank $312,682, on its claim, $48,839.69 less than the amount the bank claimed to be due.[6]

The Defendants' expressed attachment to their home of more than 40 years is understandable.  Nonetheless, the Ringwood property is a valuable asset which could have been used to pay the Debtor's debt to McHenry Savings Bank had the Defendants not transferred ownership to the tenancy by the entirety trust.  Illinois has determined that its protection of a debtor's rights in her residence through the homestead exemption is subject to a cap of $15,000. 735 ILCS 5/12-901.  The potential detriment faced by co-owner Kathleen Paulsen is an issue addressed below in the context of the Trustee's motion to sell the residence, including her interest, pursuant

---

[6] The settlement agreement document received in evidence (Def.'s Ex. A) is not signed by the bank and no evidence was presented that the bank ever did so.

to section 363(h) of the Bankruptcy Code and is not relevant to the issue of whether the property was transferred into tenancy by the entirety with the sole intent to avoid payment of debt. As to Counts I and II of the adversary complaint, the preponderance of the evidence shows that at the time of the transfer the Debtor was solely concerned about his ability to repay the McHenry Savings Bank, and that he transferred his interest in the Ringwood residence with the intent to lessen the amount he would have to pay the bank through settlement or to insulate it from the bank should settlement efforts not succeed.

The Defendants next argue that even if the Debtor intended to place the Ringwood residence beyond the bank's grasp and avoid payment of his debt through the transfer, he had other legitimate purposes for the transfer. The Debtor testified that the Paulsens put the house into the trust in response to Kathleen's concerns that "in case we died that [the house] was protected from going into probate." James claimed, without objection, that Kathleen was concerned about what might happen if a home went into probate and that he and she "wanted our family to be protected in the future . . . protected from if we died." By way of explanation, Kathleen testified that she attended a seminar on November 6, 2018, during which there was some mention of wills and "avoiding going into probate." But the Defendants offered no specific situations they wished to avoid, mentioning only a vague wish to "avoid probate" and protecting the house if the Paulsens "had a car accident or something."

Lacking credible support, the Defendants' vague explanations offered at trial amount to little more than after-the-fact concoctions to avoid the "sole intent"

exclusion.  Other courts have found such vague and self-serving explanations to be unpersuasive and insufficient to overcome tangible, credible evidence of a debtor's sole intent.  For example, in a 2012 decision, a bankruptcy court found the debtor's allegation that he made the transfer "upon the advice of his attorney who was handling" the debtor's defense in a state court suit by a creditor to be  "not credible and . . . belied by the fact that the quit-claim deed transfer occurred on the very same day that judgment was entered against him in the Plaintiff's State Court proceeding." *Wood v. Meredith (In re Meredith)*, Nos. 11-90525, 11-9058, 2012 Bankr. LEXIS 2234, at \*12 (Bankr. C.D. Ill. May 18, 2012).[7]

Similarly, in *LaSalle Bank, N.A. v. DeCarlo*, the Illinois appellate court affirmed the trial court's rejection of such proffered motivations in its determination that the debtor's sole intent was to avoid payment of debt, finding the debtor's reasons for the transfer "vague, inarticulate, and specious." 336 Ill. App. 3d 280, 287 (2003). In *DeCarlo*, the debtor and his wife transferred their interest in their home from joint tenancy to tenancy by the entirety two weeks after an appellate court affirmed a judgment against the debtor and his company. The debtor testified that he transferred his interest on the advice of  "a family attorney and a realtor" he received earlier in the year, and he had "wanted to protect the estate and make the 'transfer easier' upon his death, since his assets were tied up in the business." *Id.* at 286.  The

---

[7] It is not necessary for the debt to be reduced to an actual judgment to fall within the "sole intent" exclusion under section 12-112.  "Section 12-112 does not mandate that a monetary judgment be entered before a debt can be found to exist at the time of the fraudulent transfer." *NAB Bank v. LaSalle Bank, N.A.,* 2011 IL App (1st) 102594-U, ¶ 34; *see also, e.g., In re Stacy*, 227 B.R. 272, 278 (Bankr. N.D. Ill. 1998) ("The Court concludes that the plain meaning of the phrase 'existing debt' is not limited to only those debts which have been reduced to judgment in favor of one or more creditors.").

trial court found this vague testimony lacked credibility, noting in particular the timing of the transfer. Further, the court found that the debtor was insolvent or made insolvent by the transfer, and that since the property was already owned in joint tenancy, the transfer did not appear necessary for the stated purpose of making transfer "easier" upon his death. *Id.* Here, as discussed below, at the time of the transfer the Debtor was insolvent, and the Ringwood property already was held in joint tenancy. And as in *DeCarlo*, the court finds the Defendants' testimony about their motivations to be self-serving, and to lack credibility and reliable support.

The Defendants cite to a pair of bankruptcy decisions to argue that estate planning on advice of counsel constitutes a legitimate purpose saving transfers such as theirs from the "sole intent" exclusion. *In re Tolson*, 338 B.R. 359 (Bankr. C.D. Ill. 2005); *In re Werner*, 410 B.R. 797 (Bankr. N.D. Ill. 2009). In *Werner,* the court found that reliance on advice of an accountant and the debtor's concerns about future liabilities motivated the transfer. 410 B.R. at 812. Notably, the court in that case found the timing of the transfer, 14 days after the debtor lost a TRO motion against the creditor, to be "suspicious." *Id.* at 810. However, it found the debtor's explanation to be credible, supported as it was by testimony of third parties and because he had discussed and requested advice and assistance for the transfer of the property into tenancy by the entirety several years before the transfer and before he guaranteed the loan at issue. The *Werner* court also found credible the debtor's explanation for his delay in completing the transfer. The fact that the litigation years later may have been the "final straw" or "accelerating factor" to carrying out the transfer was

insufficient to prove that the litigation over his business debt was the "sole" cause for the transfer. *Id.* at 812.

Here, in contrast, the evidence shows that the Debtor only decided to transfer the property *after* learning of the McHenry Savings Bank litigation. Moreover, Werner testified as to specific, nonspeculative concerns of his future liability for his snowplowing activities and accidents that might occur while he drove farm machinery on public roads, which he did regularly. In contrast, the Defendants here offered only vague and speculative generalized testimony about the possibility of car accidents. They failed to address the likelihood of any accident involving Mr. Paulsen. Moreover, the Debtor's bankruptcy schedules list an expense for vehicle insurance, and yet they did not address why any liability for an accident would not already be covered by such insurance. Further, Werner's transfer occurred before the bank had called his guaranty or taken steps to collect its debt from him. Mr. Paulsen, on the other hand, was directly liable on the debt and McHenry Savings Bank had asserted a default and filed a complaint naming the Debtor before he transferred his interest.

*In re Tolson* is similarly inapplicable. The debtor in that case contended that his spouse had "concern about avoiding probate" if the debtor predeceased her, and therefore asked a lawyer to prepare a deed, along with a will. 338 B.R. at 365. Tolson testified that he acted on his lawyer's recommendation. *Id.* At issue in that case, as in this, was a business debt which the debtor had co-signed. Notably, however, the *Tolson* decision contains no indication that as of the date of the transfer the underlying debt was in default, the business or the debtor was unable to pay the debt

as it came due, or the creditor was taking any collection efforts. While the opinion is not entirely clear as to when the debt went into default, it states that judgment was entered against the debtor almost 4 years after the transfer.

Notably, the property interest in *Tolson* was not transferred from joint tenancy to tenancy by the entirety. Tolson's spouse had discovered she was inadvertently left off the title. The debtor testified that when the couple was refinancing their mortgage several years before the business transaction at issue, his wife discovered that she was not listed as a joint owner on the property. She then expressed concern, but Tolson only got around to consulting a lawyer about the problem when he met with lawyers for the contemplated business transaction. Since the spouse in *Tolson* was not named on title at all, her concerns about "probate" were concrete, specific, and credible in contrast to those expressed at trial by Mrs. Paulsen. And unlike here, the debtor in *Tolson* credibly testified that he intended to transfer their property to a tenancy by the entirety well before obtaining his business loan.

Another decision, not cited by the Defendants, illustrative of circumstances when a court may find a legitimate purpose other than debt avoidance for the transfer is the bankruptcy court's 2006 decision, *In re Moreno.* 352 B.R. 455 (Bankr. N.D. Ill. 2006). In that case, the debtor and his non-filing spouse sold their house owned in joint tenancy and purchased a new house which they titled in tenancy by the entirety while a suit on a personal guaranty of business debts was pending and shortly before a judgment was entered. The unrebutted testimony of the debtor explained that he and his wife sold their former house so that "his family could live in a better home in

a better neighborhood and environment" free of gangs.  He further testified that this was a "major consideration" because as they had two minor children and an 18-year-old daughter residing with them. *Id.* at 458.  While the court noted that the sale, five days before judgment was entered, was "suspicious," it found that the creditor had failed to demonstrate that the desire to move his family to a better neighborhood was not a legitimate, and indeed, "sensible family reason." *Id.* at 461.

Such circumstances are not found here.  While the Paulsens refer to "estate planning", they do not explain why tenancy by the entirety was necessary except for a vague, inchoate concern about the house "going into probate."  Indeed, before the transfer of the Ringwood property, the Defendants owned the residence in joint tenancy which already has a survivorship feature for the contingency one spouse predeceased the other.

C. <u>Ability To Pay Debt As It Became Due</u>.

"[A]bility to pay . . . debts as they become due" is not a balance sheet solvency test. *Harris Bank, N.A. v. Werner (In re Werner)*, 410 B.R. 797, 806 (Bankr. N.D. Ill. 2009).  But neither is the analysis limited to "cash flow from operations." *Id.*  The ability to repay obligations through the liquidation of assets, including collateral securing the debt, is also relevant to the analysis.  Intent is subjective, while the existence of the debt and ability to pay are objective.[8]

---

[8] The term "sole intent" modifies the verb phrase "to avoid the payment of debts" in the Illinois statute. The phrase "existing at the time of the transfer beyond the transferor's ability to pay those debts as they become due" modifies the noun "debts." 735 ILCS 5/12-112.  In limiting the types of debt applicable, it sets forth an objective test.  The debtor's subjective belief that he had the ability to repay a certain debt is not relevant to that inquiry, though it may be relevant to the issue of whether the debtor intended to avoid the payment of debt.

The Trustee established that the Debtor and his son were not making timely payments on the McHenry Savings Bank debt. The January 9, 2019 payoff letter states that the last payment was received on July 20, 2018. In addition to late charges of between $112 and $131 for each of the months of September, October, November, and December 2018, it states total late charges of $5,431.94 from before September 2018, suggesting a history of late payments even before the Paulsens stopped making payments. (Pl.'s Ex. 1N.) Mr. Paulsen did not plausibly dispute the late charges or the payoff amount at trial. Instead, he questioned how the payoff amount could be larger than the original principal amount of $345,000. He admitted that "he had difficulty making the monthly payments in a timely fashion," largely because his "only source of business income was the sale of equipment." The Defendants acknowledge that Paulsen Paving wound down and closed in 2016 or 2017 and Mr. Paulsen testified that the company "was generating no income whatsoever" in 2016, 2017 and 2018.

The Debtor also admitted that he did not pay on time the property taxes on the commercial real estate. The 2016 taxes payable in 2017 went unpaid and ultimately were sold to a tax purchaser. Although the Debtor and Daniel ultimately redeemed those taxes by paying just over $10,000 in April 2019 – three months after the transfer into tenancy by the entirety – that payment was made possible by selling business equipment that was already collateral of McHenry Savings Bank.

The Debtor is listed as retired in his bankruptcy schedules. He acknowledges that his only income are the payments he receives from Social Security. The Debtor's October 29, 2019 schedules, filed approximately 10 months after the transfer, list his

and Kathleen's combined monthly income as $5,374 and estimates their monthly household disposable income to be $180. His Statement of Financial Affairs suggests that his income may have been even lower at the time of the transfer. Although his scheduled income lists monthly Social Security income to be $1,928, his Statement of Financial Affairs states that he received only $13,000 from Social Security between January 1 and October 29, 2019. The Debtor states that his total gross income for the prior year was only $22,500 and $19,200 in 2017.[9]

The Defendants nevertheless contend that at the time of the transfer the Debtor could have repaid McHenry Savings Bank's debt in full through sale of the commercial property for $275,000, sale of business equipment for $50,000 and the $50,000 loan from Mr. Lederer. The evidence shows otherwise as discussed above. The $50,000 figure for the equipment had very little support and was based almost exclusively on Daniel's unsupported conjecture.[10] Indeed, the fact that the Paulsens were selling equipment piecemeal over the prior two years even though the business was no longer operating casts doubt on the liquidity and value of that property which remained.

Proof supporting the $275,000 figure the Defendants claim was available from

---

[9] Nor do the schedules filed by Daniel Paulsen in his bankruptcy indicate that he had the ability to pay the McHenry Savings Bank debt.

[10] The Defendants presented a one-page undated list of equipment together with estimates of values to support this contention. Daniel testified that he prepared the list using his own knowledge for the estimates of value. Most of the asserted value comes from two items: a 2007 skid steer listed as "+/- $26,000" and a 1975 Bobko dump trailer listed as "+/- $10-12k." The other items, most of which are vehicles denoted "doesn't run," are expressly described as "in disrepair or of little value" and it is stated that "value estimates provided are educated guesses." No independent valuations for these items were offered at trial.

a sale of commercial property is similarly lacking. Defendants' own evidence suggests such claim to be seriously optimistic, at best. It is undisputed that the Paulsens never found a buyer who was able to fund its purchase of the property either before or after the transfer. In 2016, the Paulsens listed the property for $390,000. While they vaguely recalled some interest in the listing, and even of receiving offers in that range, the Debtor admits that nothing came of it. The Debtor acknowledges that his $275,000 figure is based on the post-transfer offer from Mr. Lederer but concedes that this also fell through. The Defendants present no proof that any other offer for the commercial property was received at this or any price around the time of the transfer or since.

Also noteworthy is the evidence of unresolved environmental issues surrounding the property discussed above. Although Mr. Lederer required an environmental site assessment in his proposed sale agreement, it is undisputed that the Debtor never obtained a clean environmental report for the property. The evidence of such unresolved issues further cast doubt on the Debtor's valuation of the property and his ability to quickly liquidate it to repay the bank debt.

In *Werner*, unlike the present case, the Debtor was not shown to be unable to pay his outstanding debt at the time of the transfer. Among other things, that debt involved a guaranty that had not been called by the time of the transfer. The court accordingly discounted the potential debt to reflect the probability that the contingency triggering the liability would in fact occur when the transfer took place. Here, on the other hand, the liability of the Debtor – a co-signor on the loan – had been triggered before the transfer took place. As of the moment of the transfer, McHenry

Savings Bank had already asserted a default, demanded payment in full and sued the Debtor individually. The circumstances presented in this case rather are more like those found in *NAB Bank v. LaSalle Bank, N.A.* 2011 IL App (1st) 102594-U, ¶ 43. In that case, the court found sufficient evidence of an inability to pay a debt as it became due where judgment was entered five years after the transfer, as of the date of hearing no payment was made in satisfaction of the judgment, and the debtor did not have the means to satisfy the judgment absent the selling of real estate.

This court therefore will find that the Trustee met his burden to avoid the transfer of the Debtor's interest in the Ringwood property into the family trust. Accordingly, said transfer will be avoided and the Debtor's exemption in such interest will be disallowed.

D. <u>Benefit Of Sale Free Of Interests Not Shown To Outweigh Detriment.</u>

Through the third count of the complaint, the Trustee seeks not only to sell the recovered interest of the Debtor, in the nature of a joint tenancy interest, but also to sell the Ringwood property in full, including Kathleen or the trust's joint interest. Section 363(h) of the Bankruptcy Code authorizes the trustee to sell not only the estate's interest but also the interest of a co-owner as tenant in common, joint tenant or tenant by the entirety, but only if:

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or

distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h).  Here, the Trustee concedes that he has no actual proposal to buy the Ringwood property.  Thus, it is not possible at this time for the court to determine whether the benefit to the estate of a sale outweighs the detriment to the co-owners. As such, the Trustee's request in Count III is premature.  Judgment on that count therefore will be entered in the Defendants' favor but without prejudice to a future action to sell the property.

## CONCLUSION

Accordingly, judgment will be entered in favor of the Trustee on Counts I and II of the complaint.  The transfer of the Debtor's interest in the Ringwood property as joint tenant to the family trust will be avoided and his claim of exemption in such interest under 735 ILCS 5/12-112 will be disallowed.  Judgment in favor of the Defendants will be entered on Count III of the Trustee's complaint without prejudice. The Debtor's motion to compel the Trustee to abandon the estate's interest in the residence and trust will be denied without prejudice.  A separate order will be entered giving effect to the determinations reached herein.

DATE: March 30, 2022

ENTER:

_____

Thomas M. Lynch
United States Bankruptcy Judge